Filed 10/13/21  P. v. Reddy CA4/2
Opinion on remand from Supreme Court

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for
publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication
or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E074385 |
| v. | (Super.Ct.No. INF1700068) |
| KEVIN JAMES REDDY, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County. John M. Davis, Judge.

Affirmed as modified.

Susan S. Bauguess, under appointment by the Court of Appeal, for Defendant and

Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney

General, Julie L. Garland, Assistant Attorney General, Michael Pulos and Nora S. Weyl,

Deputy Attorneys General, for Plaintiff and Respondent.

1

Appellant Kevin James Reddy got into an altercation with an acquaintance who was staying in his home. Reddy was armed with a semiautomatic handgun, which went off and struck the acquaintance in the torso. The victim survived but suffered substantial injuries. At trial, the jury heard different versions about the fight from the victim, who testified, and Reddy, whose shifting versions of the events came in through statements he had given to the police. The jury credited the victim and found Reddy guilty of assault with a firearm, which it found Reddy used during commission of the assault.

Reddy appeals his conviction on two grounds. First, he argues the trial court erred by redacting from a sworn declaration by the victim made in a separate civil suit the fact that he believed the shooting was accidental. However, defense counsel used the prior statement as a means of getting the victim to admit he had signed such a statement and to explain what he meant by it. Thus, the statement in the declaration itself was cumulative and its exclusion was not prejudicial.

Second, Reddy argues there was insufficient evidence that he acted willfully in shooting the victim and that he wasn't acting in self-defense. However, the jury could have credited the victim's testimony about the event, according to which Reddy left the scene of a fight between the two, went to another room hunting frantically for something, and then returned to the victim and shot him immediately upon finding him in the hall. That testimony supported the jury's finding that Reddy acted willfully and not in self-defense.

Reddy also appeals the imposition of a $10,000 restitution fine, a $10,000 parole revocation fine, a criminal conviction assessment of $60, a court operations assessment of $80, a booking fee of $514, a presentence probation report fee of no more than $1,095, and $175,000 in victim restitution on a variety of grounds. Reddy objected to none of these fines, fees, and assessments in the trial court and has therefore forfeited those arguments. With respect to the victim restitution, he has also failed to present a sufficient basis for overturning it on the merits.

However, the California Supreme Court granted Reddy's petition for review and directed us to vacate our decision and consider whether Assembly Bill Number 1869 (Stats. 2020, ch.92, §§ 11 & 62), which became effective July 1, 2021, alters Reddy's obligations. We invited the parties to submit supplemental briefs addressing the issue, and now conclude Reddy is entitled to relief from the portion of the fees imposed by the court under Government Code section 29550 and Penal Code section 1203.1b.

## I

## FACTS

A. *The Offense*

In the early morning hours of December 27, 2016, Kevin James Reddy and his friend David had an altercation at Reddy's house in Indio. David was shot but survived. David had been staying at Reddy's house for a few days. He said Reddy's father had asked him to keep an eye on Reddy because he was having problems with his ex-wife, who had left and taken their son.

3

Before the shooting, Reddy and David had watched football and drank beer with Reddy's parents and David's girlfriend. After the game, the others left for their homes, but David and Reddy stayed up for a while smoking marijuana and talking. David said Reddy was upset that he hadn't been able to spend Christmas with his wife and son. Around 10:30 or 11:00 p.m., David went to bed, but Reddy stayed up and kept drinking. Within about an hour, Reddy burst into David's bedroom wanting to show off one of his handguns. He said Reddy appeared "buzzed" and was staggering and slurring his words. David told him to get out of the bedroom, and Reddy left on his own.

About 15 minutes later, Reddy came back. "[T]he door burst open again, but this time it was a little more forceful. And he was waving another gun around or whatever. And I was, like, 'Dude, really, you know? Shut it down man. Turn in." Reddy responded, "Check this gun out, bro." David said he was startled and irritated the second time and was harsh with Reddy and forced him out of the room. "I said, 'This is bullshit, man.' . . . I started going off on him about, you know, that's his son's room. So . . . I said, 'Hey, do you do this to your son and wife? Is that why they took off.'" David said he pushed Reddy out of the room, and they struggled at the door. Before closing the door, David threatened he was "going to fuck [him] up" if he came in again, which he explained was intended as a threat to hit Reddy.

Reddy came back anyway. David said this time Reddy came through the door "almost kicking it. Was Rambo shit." According to David, Reddy held a different handgun and was waving it around and pointing it at him. At one point Reddy said, "I

4

could kill you." David jumped out of bed and hit Reddy once or twice with his fist. He said by this point he was scared Reddy was going to shoot him. He told him to drop the gun and tried to "wrap him up." They struggled over the weapon, staggered out of the bedroom, and eventually ended up in a bathroom. Reddy refused to release the gun and demanded to be released. Eventually, David released Reddy, and "he came out of his restroom and went back towards the hall towards the living room."

David said he could hear Reddy frantically going through drawers in the living room. He crept closer to see what Reddy was doing and looked around the corner. Reddy came around the corner from the other direction and looked surprised when he saw David. His hand came up and he shot David in the torso. David yelled, "You just killed me, MF. You just killed me. What's wrong with you?" and then went to his bedroom to get his cell phone and call for emergency assistance. While heading for the door, he heard Reddy say, "Dad, I just shot Dave." Phone records indicated Reddy had called his father at 1:05 a.m. and the call lasted 12 seconds. David said Reddy saw him as he was leaving and told him to get out of the house.

Police arrived at about 1:07 a.m. and found David on the ground two houses away from Reddy's house. An ambulance arrived and took him to the hospital. At 1:12 a.m., Reddy called to report the shooting. Reddy asked for medical assistance and said he had been attacked. Reddy reported that David had been armed with a gun and beat him up. Reddy claimed he took the gun from David and shot him in self-defense. Phone records show Reddy again made a short call to his father at 1:15 a.m. and then received a

somewhat longer call from his father at 1:18 a.m. He then received a second short call from an unregistered number at 1:18 a.m. At about 1:19 a.m., Reddy came out of his house with his hands up.

Police detained Reddy and drove him to the police station. During the drive, Reddy said he had to shoot David because he was acting crazy and he thought David was going to shoot him. He said he tried to help, but David was using drugs and attacked him. The officer observed Reddy had a swollen left eye with a couple of drops of blood near the swelling and appeared to have abrasions near the back of his neck and left ear. The police drew Reddy's blood at 5:36 a.m. and found he had a blood alcohol concentration of .12 percent.

Officers found a .32-caliber semiautomatic handgun on the floor inside Reddy's house, near the front door. The gun had a live round in the chamber and a magazine with four additional rounds. It was in a loaded and cocked position. They found a casing on the dining table and a live round on the floor. They found a pair of David's jeans on the floor of the room where he was staying. A holster was attached to the jeans and a magazine holding .32-caliber ammunition was in the jeans front pocket. David testified that the holster didn't belong to him and said he didn't have a magazine with ammunition in his jeans pocket the day of the shooting. A detective testified that pants material wouldn't be bunched up underneath a holster clip, as it was on David's jeans, if the holster had been affixed when a person was wearing the pants. The investigator said it looked like the holster had been planted on David's pants.

In a videotaped interview with detectives, which the jury viewed, Reddy claimed their fight started when he told David he had to move out of the house the next day. Reddy said he told David to leave because he suspected David was using methamphetamine in his house and it was making him nervous. He said David said he wouldn't leave, and Reddy told him to leave immediately, and David responded by attacking him. "I'm like, 'Dave, so what's up? You know, what's your plan, are you leaving? Are you, you know, what are you doing?' And he turns to me and snaps at me—just snaps at me, just like that. He gets right in my face and pushing me back—and pushing me against the wall. I go, 'Dude, what the fuck man, what are you doing?' The next thing you know, we're fighting." According to Reddy, David took a gun out of his waistband and pointed it at his face. Reddy said he took defensive action, grabbed the gun, and in doing so it went off.

Reddy tried to demonstrate how he took the gun, but one of the detectives expressed skepticism and asked for a fuller explanation. Reddy demonstrated the move, saying he had "crossed [his] hands like that" and said his finger was probably on the trigger when he grabbed the gun. Reddy said he didn't intend for his finger to be on the trigger, but the gun went off when he took it from David and was pulling back "because [he] finally had it." After the shooting, David stopped fighting and Reddy ordered him to leave. Reddy told the police he didn't know David had a gun.

One of the detectives conducting the interview was trained in weapons retention and takeaway and was a former firearms instructor. The detective told the jury Reddy's

7

description of his defense tactics was suspicious and was not a technique in which he and his officers were trained. The detective said he had seen the type of weapon removal technique Reddy claimed he had used only on television programs.

Investigators asked several times if Reddy had additional guns or ammunition at his home. At first, Reddy said the only gun was a registered shotgun he kept under his bed. Asked about ammunition, he said he had a safe in his garage that had ammunition for an SKS but that he no longer had the weapon. When asked for the garage safe combination, Reddy hesitated and then changed his story, saying the safe contained a Japanese rifle. He denied the safe contained handguns or handgun ammunition. When the detectives told him they would have to break the safe open, Reddy said it contained private paperwork. Reddy then admitted there was also a .22 Winchester in the safe. He again denied having handguns in the house.

After the interview, detectives returned to Reddy's home. There, they found in the safe a box of the same .32-caliber ammunition for the gun used in the shooting. Some ammunition was missing from the box. Based on the ammunition round markings, the detective told the jury he believed the ammunition recovered from the garage safe matched the ammunition inside the handgun which had been used in the shooting. The police found other guns throughout the house, and also found ammunition to match each gun. Only the gun used in the shooting matched the .32-caliber ammunition found in the safe.

After police had located the .32-caliber ammunition and other items, they confronted Reddy about what they'd found. When asked about the .32-caliber ammunition and told him they would send it to the lab with the gun, Reddy changed his story and admitted the .32-caliber gun used in the shooting belonged to him and claimed David had taken his gun. The investigator asked how David could have found Reddy's gun since all his guns were locked up. Reddy initially agreed, but then said not all his guns were locked up. He said David must have found the gun in Reddy's bedroom dresser when he'd left to go shopping. Asked why he had lied at first, he said they wouldn't have believed him if they knew he owned the gun.

David was in the hospital for about two weeks. He was interviewed by detectives four or five days after the shooting, while recovering from surgery. He told a detective Reddy had said, "I could kill you right now," when he first came into the room to show him a gun though David also said he didn't take the comment as serious at that point. However, by the time of the fight, David said he "thought he was going to shoot me. I was scared, you know? The fear had escalated. It wasn't just like, you know, the first couple times he came in, I just blew it off."

David suffered a gunshot wound to his abdomen and the bullet went through his liver. The gunshot resulted in bleeding and lacerations to the liver for which David underwent two separate surgeries.

David acknowledged he had used methamphetamine at some point before he stayed at Reddy's house but said he hadn't used methamphetamine while staying there.

9

He also acknowledged he had prior felony convictions for welfare fraud, grand theft, theft from an elder person, vehicle theft, providing a false name to police, and a misdemeanor conviction for fighting with a police officer.

## B. *Defense Case*

In his defense, Reddy presented evidence tending to heighten David's responsibility for the incident and undermine his credibility. A police officer testified that David told him he and Reddy were fighting over a gun when he was shot. He also reported that David tested positive for amphetamine, methamphetamine, and cannabinoids the morning after the shooting. Reddy's father said Reddy called him after midnight the night of the incident and said he and David had been in an argument, David had punched him in the face and pulled a weapon, and David had been hit when the weapon went off. A private investigator said he didn't believe the fabric being bunched up under the holster clip supported the police investigator's conclusion that it had been placed on the pants while they were on the floor. The owner of a moving business testified that David worked for him, was twice rehired and fired, but was terminated for poor attendance and other issues, was untrustworthy and dishonest.

## C. *Conviction and Sentence*

On October 9, 2019, Reddy pled guilty to possessing an assault weapon. (Pen. Code § 30605, subd. (a), unlabeled statutory citations refer to this code.) The next day, a jury found Reddy guilty of assault with a firearm (§ 245, subd. (a)) and found appellant

had personally used a firearm during commission of the assault (§§ 12022.5, subd. (a) & 1203, subd. (e)(2)).

The trial judge subsequently sentenced Reddy to a term of three years in state prison, plus three consecutive years for the enhancement. The trial judge sentenced Reddy to 16 concurrent months for possessing an assault weapon. The trial judge also imposed certain fines, fees, and assessments discussed in detail in part II.C.

Reddy filed a timely notice of appeal.

## II

## ANALYSIS

A. *Redacting the Declaration*

Reddy argues the trial judge erred by redacting David's statement that he believed the gun had discharged accidentally from a declaration he had signed under penalty of perjury. Reddy argues redacting the statement was a prejudicial abuse of discretion.

1. *Additional background*

During pretrial proceedings, defense counsel disclosed that David had signed a declaration under penalty of perjury in a civil lawsuit against Reddy and his homeowner's insurance company. Defense counsel represented David had recovered several hundred thousand dollars in that lawsuit and had "made yet another version of events of how this thing happened" and said, "I intend to use that explanation." The judge said the declaration would seem to be admissible for impeachment purposes if David

11

"testifies inconsistently with [the signed statement] at trial." He ruled any monetary recovery David received in the civil proceeding was irrelevant and inadmissible.

At trial, defense counsel cross-examined David on whether he had signed a declaration in another case which said he believed the shooting could have been an accident. "In that separate proceeding, did you, in fact, sign an affidavit indicating that in your opinion the shooting could have—was an accident?" David responded, "Yeah, I felt it could have been at the time." Counsel then asked, "And what motivated you to sign that document and declare under penalty of perjury you thought it could have been an accident?" David responded, "Because of his disposition—his mental disposition is the only reason I thought that it might have been an accident at the time." Defense counsel didn't offer to show David the declaration during this line of questioning. When he later asked David if he recognized the declaration, the prosecutor objected, and the court held a sidebar discussion off the record.

Following the sidebar, defense counsel asked David if he had signed and dated the document, whether it was made under penalty of perjury, and whether he had stated in the document, "Reddy came back a few minutes later. And again, [he] brandished the gun. I got up, and we struggled with me trying again to get the gun away from [him], but the gun went off shooting me in the stomach." David acknowledged the statement and his signature on the declaration but said he didn't remember making the statement. The trial judge then ordered defense counsel to stop the line of questioning. The next sentence in

the declaration says, "I believe this was an accidental discharge of the gun by Mr. Reddy."

At the close of evidence during discussion of the admission of exhibits, the trial judge returned to the admissibility of the declaration. The trial judge noted, "I previously ruled [the declaration] was not to be admitted because the statement in there by the victim that it was an accidental shooting was speculative. And so defense wants it in and also wants to make more of a record."

Defense counsel argued the entire declaration was admissible because David's whole description of the incident differed from his description of the incident in his direct testimony, including the statement that he thought the shooting was accidental. Defense counsel acknowledged, but disagreed with, the trial court's ruling that the statement that David believed the gun accidentally discharged was speculative. He asked for the entire declaration to be admitted but suggested that if the trial court wanted to exclude the declaration based only on the last line, that sentence could be redacted.

The prosecutor objected that defense counsel had questioned David about the entire statement, and "everything that was in the statement was elicited on the stand." He objected that "it would be tantamount to me marking police reports and saying I'm going to submit this to the jury because it marks what the contradictory, what the impeachment testimony is." He also objected that the declaration was hearsay.

The trial judge ruled the entire declaration would be admitted except for the sentence, "I believe this was an accidental discharge of the gun by Mr. Reddy."

13

### 2. *Legal analysis*

Reddy argues the decision to redact the line of the declaration was error which deprived him of his right to a fair trial. He argues the statement that David believed the shooting was accidental was important relevant evidence because his direct testimony was inconsistent with that statement.

"No evidence is admissible except relevant evidence," and "[e]xcept as otherwise provided by statute, all relevant evidence is admissible." (Evid. Code, §§ 350, 351.) That bar is low; evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.)

However, a trial judge may exclude relevant evidence under Evidence Code section 352 "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, or confusing the issues, or of misleading the jury." (Evid. Code, § 352; see also *People v. Miles* (2020) 9 Cal.5th 513, 587.) "'[T]he exclusion of evidence which has only a cumulative effect will not justify reversal on appeal.'" (*Horn v. General Motors Corp.* (1976) 17 Cal.3d 359, 371.)

We review the trial judge's exercise of discretion in admitting or excluding evidence for abuse of discretion. (*People v. Merriman* (2014) 60 Cal.4th 1, 74.) We won't disturb an evidentiary ruling "*except* on a showing that the court exercised its

14

discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Miles*, *supra*, 9 Cal.5th at pp. 587-588.)

The decision to exclude David's written statement that the shooting may have been an accidental discharge fell within the trial judge's discretion under Evidence Code section 352. This is so for the very simple reason that defense counsel ably used the contested statement in the declaration to elicit David's testimony acknowledging he had previously said he believed the weapon had discharged accidentally. He asked, "In that separate proceeding, did you, in fact, sign an affidavit indicating that in your opinion the shooting could have—was an accident?" David responded, "Yeah, I felt it could have been at the time." Counsel then asked David to explain why he thought it was an accident. David responded, "Because of his disposition—his mental disposition is the only reason I thought that it might have been an accident at the time." What this testimony shows is that defense counsel used the prior statement to elicit the impeachment testimony Reddy now claims was excluded from trial. Thus, the trial judge could reasonably have excluded the statement in the declaration itself as cumulative under Evidence Code section 352. (See *People v. Duff* (2014) 58 Cal.4th 527, 558.)

In any event, the same consideration shows the ruling was not prejudicial. Excluding the written statement couldn't have caused Reddy prejudice when his counsel had already obtained testimony on precisely the same point. The jury could have concluded based on that testimony that David had changed his story about Reddy's culpability to suit his own purposes. It could have found David to be a witness who

lacked credibility as a general matter or on details of the shooting. As it happens, the jury appears not to have rejected David's testimony on that basis. But the fact that the jury already knew about his prior statement convinces us it's not reasonably probable providing the jury with an exhibit making the same point in written form would have produced a more favorable result. (*People v. Partida* (2005) 37 Cal.4th 428, 439.)

B.  *Substantial Evidence Supports the Assault with a Deadly Weapon Conviction*

Reddy argues insufficient evidence supports his assault with a firearm conviction because (1) there was a lack of evidence that he acted willfully; and (2) the prosecution failed to sustain its burden of proving he didn't act in self-defense.

In a challenge to the sufficiency of the evidence, we review "the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible and of solid value— from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.]" (*People v. Snow* (2003) 30 Cal.4th 43, 66.) "We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. A reviewing court neither reweighs evidence nor reevaluates a witness's credibility." (*People v. Booker* (2011) 51 Cal.4th 141, 172 [cleaned up].) "Unless it describes facts or events that are physically impossible or

16

inherently improbable, the testimony of a single witness is sufficient to support a conviction." (*People v. Elliott* (2012) 53 Cal.4th 535, 585.)

To prove assault with a firearm, the prosecution must establish: (1) the defendant willfully committed an act with a firearm that by its nature would directly and probably result in the application of force on another person; (2) at the time, he was aware of facts that would lead a reasonable person to realize his act would directly and probably result in the application of force; (3) he had the present ability to apply force with a firearm; and, (4) he did not act in self-defense. (§ 245, subd. (a); *People v. Aznavoleh* (2012) 210 Cal.App.4th 1181, 1186-1187.) Assault is a general intent crime, which doesn't require a specific intent to injure the victim. (*People v. Wyatt* (2012) 55 Cal.4th 694, 702.)

1. *Willfulness*

Reddy argues the evidence was insufficient to show he acted willfully. He emphasizes the testimony that after an initial struggle, the two separated and he walked toward the living room. The shooting occurred only then, after a surprise re-encounter coming around a corner. "Appellant had a surprised look on his face. Just then, their 'eyes met,' appellant's hand came up and [David] was shot 'center mass.' Thereafter, [David] noted [Reddy]'s 'eyes got big.' [Citation.] Based on that testimony, [Reddy's] response to seeing [David] suggested the encounter to be a total surprise to him and even to [David]." Reddy concludes this evidence shows Reddy did not fire the gun at David willfully or on purpose.

17

It's true that is one inference the jury could have drawn from the evidence. However, it's also clear the jury didn't draw that inference. It's not our job to determine which inference was best supported, but whether the inference the jury in fact made has substantial—meaning solid, reasonable—support. We think it did. David said Reddy busted into his bedroom when he was trying to sleep three times to show him various guns. The second time, David warned Reddy he would hit him if he came in again. Nevertheless, Reddy persisted, and David followed through by attacking him. After the two struggled, David let Reddy go, and Reddy went toward the living room area.

But Reddy's aggressive behavior didn't stop there. David said he heard Reddy frantically going through drawers and went to investigate. David said Reddy came back, saw David, raised his arm, and shot him. This evidence underwrites the inference that Reddy never put the gun down even after the confrontation had ended, but instead was walking around the house with a semiautomatic handgun. It also supports the inference that Reddy was returning to find David. The fact that Reddy was surprised when he found David coming around the corner toward him isn't in any way inconsistent with the jury's finding that he acted willfully. If Reddy was going back armed to accost David in his bedroom, finding him unexpectedly outside the room would of course have been surprising and even frightening. It's Reddy's conduct, not his facial expressions, that speak most plainly about his purpose. And what Reddy did, according to David, was raise his arm and fire a loaded handgun at David. The jury acted reasonably in finding from that evidence that Reddy acted willfully.

In any event, "[a]ssault with a deadly weapon can be committed by pointing a gun at another person, but it is not necessary to actually point the gun directly at the other person to commit the crime." (*People v. Raviart* (2001) 93 Cal.App.4th 258, 263 [cleaned up]; *People v. Miceli* (2002) 104 Cal.App.4th 256, 268-269 [pointing loaded gun at the victim may constitute assault with a firearm even if no attempt is made to fire the weapon].) Simply holding the handgun that enabled him to use it was grounds for the jury finding that Reddy had an intent to shoot David. (*People v. Thompson* (1949) 93 Cal.App.2d 780, 782 [although the defendant did not point the gun directly at the victims, because it was positioned to be used instantly the evidence supported an assault conviction].)

## 2. *Lack of self-defense*

Reddy also argues the People failed to prove beyond a reasonable doubt that Reddy was not acting in self- defense.

"Self-defense is a defense to assault with a firearm . . . [¶ . . . ¶] The People have the burden of proving beyond a reasonable doubt that the defendant did not act in lawful self-defense." (CALCRIM No. 3470.) The jury was instructed that "[t]he defendant acted in lawful self-defense if: [¶] 1. [He] reasonably believed that he was in imminent danger of suffering bodily injury or was in imminent danger of being touched unlawfully; [¶] 2. [He] reasonably believed that the immediate use of force was necessary to defend against that danger; [¶] AND [¶] 3. [He] used no more force than was reasonably necessary to defend against that danger. [¶] . . . [¶] When deciding whether the defendant's beliefs

19

were reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed. If the defendant's beliefs were reasonable, the danger does not need to have actually existed. [¶] . . . [¶] A defendant is not required to retreat . . . ."

Here, a reasonable trier of fact could have found beyond a reasonable doubt that Reddy didn't act in self-defense because the circumstances didn't make it reasonable to believe he was in imminent danger. Though the two had struggled previously, David said he had released Reddy who went to the living room area still armed. Their fistic encounter had ended. Moreover, as we discussed, the evidence supported the inference that Reddy was armed and heading back toward David's bedroom when they encountered each other. The jury could have concluded Reddy was returning to confront David after their prior fight had ended, which would establish he wasn't acting in reasonable self-defense. When Reddy encountered David, David testified Reddy raised his gun and shot him when David was simply standing there. The jury could reasonably conclude from that evidence that Reddy did not have a reasonable belief that he was in imminent danger. Though this version of the events came from David, and Reddy told a different story, the testimony of a single witness is sufficient to support a conviction. (*People v Young* (2005) 34 Cal.4th 1149, 1181.)

20

C. *Fines and Fees*

Reddy argues the trial judge erred under *Dueñas*, which held that imposition of certain fines and fees on indigent defendants, without any finding as to ability to pay, violates the due process guarantees in the United States Constitution and the California Constitution. (*People v. Dueñas* (2019) 30 Cal.App.5th 1157, 1168 (*Dueñas*).) In the alternative, he argues the trial court erred because the imposition of certain fines and fees was a violation of the prohibition against excessive fines in the California Constitution. In either case, he asks us to reverse the fees, stay the imposed fines, and remand the case to the trial judge to allow him to conduct an ability to pay hearing.

His arguments reach the trial judge's imposition of a $10,000 restitution fine (§ 1202.4), a $10,000 parole revocation fine (Pen. Code, § 1202.45), a criminal conviction assessment of $60 (Gov. Code, § 70373, subd. (a)(1)), a court operations assessment of $80 (Pen. Code, § 1465.8), a booking fee of $514 (Gov. Code, § 29550), and a presentence probation report fee of no more than $1,095 (Pen. Code, § 1203.1b). He also objects that the $10,000 restitution fine exceeded the amount recommended by the statutory formula. The People argue Reddy forfeited any objection to the imposition of the fines and fees, and in any case the failure to hold an ability to pay hearing was harmless error.

Section 1202.4 requires the sentencing court to impose a minimum restitution fine of $300 for all felony convictions "unless it finds compelling and extraordinary reasons for not doing so." (§ 1202.4, subd. (c).) However, the statute instructs "inability to pay

21

shall not be considered a compelling and extraordinary reason not to impose a restitution fine" and "may be considered only in increasing the amount of the restitution fine in excess of the minimum." (§ 1202.4, subd. (c).) In other words, section 1202.4 prohibits courts from considering a defendant's ability to pay if they are imposing the minimum $300 restitution fine but allows it if they are imposing a fine greater than $300.

However, *Dueñas* changed the law and found unlawful section 1202.4's prohibition on considering inability to pay for minimum restitution fines. Indeed, the *Dueñas* court found that due process required an ability to pay hearing. The court held "that although Penal Code section 1202.4 bars consideration of a defendant's ability to pay unless the judge is considering increasing the fee over the statutory minimum, the execution of any restitution fine imposed under this statute must be stayed unless and until the trial court holds an ability to pay hearing and concludes that the defendant has the present ability to pay the restitution fine." (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1164.)

The *Dueñas* court reached a similar conclusion with respect to assessments imposed under Penal Code section 1465.8 and Government Code section 70373. Those provisions mandate assessments on every criminal conviction except parking convictions, without regard to the defendant's ability to pay. (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1164.) However, the court concluded "due process of law requires the trial court to conduct an ability to pay hearing and ascertain a defendant's present ability to pay before

22

it imposes court facilities and court operations assessments under Penal Code section 1465.8 and Government Code section 70373." (*Ibid*.)

Here, it's undisputed the trial court did not hold a hearing to determine whether Reddy had the ability to pay the fines and fees imposed. However, the People argue Reddy forfeited his right to challenge the fines and fees by failing to object when they were imposed. "In order to encourage prompt detection and correction of error, and to reduce the number of unnecessary appellate claims, reviewing courts have required parties to raise certain issues at the time of sentencing. In such cases, lack of a timely and meaningful objection forfeits or waives the claim." (*People v. Scott* (1994) 9 Cal.4th 331, 351.) "A constitutional right, or a right of any other sort, may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it." (*People v. McCullough* (2013) 56 Cal.4th 589, 593, [cleaned up].) These general forfeiture rules apply straightforwardly to a defendant claiming the trial court violated their due process right or the prohibition on excessive fines by failing to hold an ability to pay hearing under *Dueñas* if they were sentenced after *Dueñas* was decided. (See, e.g., *People v. Nelson* (2011) 51 Cal.4th 198, 227 [holding defendant forfeited his right to challenge a $10,000 restitution fine on ability to pay grounds because "[a]t the time of his . . . sentencing, the law called for the court to consider defendant's ability to pay in setting a restitution fine, and defendant could have objected at the time"].)

Here, Reddy forfeited his right to challenge the trial judge's failure to hold an ability to pay hearing. The opinion in *Dueñas* was issued on January 8, 2019. Reddy's sentencing hearing was held on December 19, 2019, nearly a year later. Reddy knew or should have known he had a right to request an ability to pay hearing at the time he was sentenced, and before his appeal. Thus, he forfeited his ability to object to the imposition of fees and fines. (*People v. Jenkins* (2019) 40 Cal.App.5th 30, 40-41 [applying forfeiture to restitution and parole revocation fines and court operations and criminal conviction assessments].) With respect to the $10,000 restitution fine, Reddy, "had a statutory right, and [was] obligated, to object to the imposition of the restitution fine[] above the $300 minimum." (*People v. Lowery* (2020) 43 Cal.App.5th 1046, 1053-1055; see also § 1202.4, subd. (c) [inability to pay may be considered when the restitution fine is increased above the minimum].)

Because of this, Reddy argues his counsel was constitutionally ineffective for failing to object and request an ability to pay hearing. To establish ineffective assistance of counsel, "the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms. Second, the defendant must show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.) On direct appeal, a defendant establishes ineffective assistance "only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked

24

for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*Ibid*.) "[R]arely will an appellate record establish ineffective assistance of counsel." (*People v. Thompson* (2010) 49 Cal.4th 79, 122.) We will find ineffective assistance of counsel only if "there could be no conceivable reason for counsel's acts or omissions." (*People v. Weaver* (2001) 26 Cal.4th 876, 926.)

The record doesn't explain why Reddy's counsel didn't object to the fines and fees. However, this decision may have had nothing to do with Reddy's ability to pay or lack thereof. A defendant's inability to pay is just one among many factors the court should consider in setting the restitution fine above the minimum. The court should also consider "the seriousness and gravity of the offense and the circumstances of its commission, any economic gain derived by the defendant as a result of the crime, the extent to which any other person suffered losses as a result of the crime, and the number of victims involved in the crime. Those losses may include pecuniary losses to the victim or his or her dependents as well as intangible losses, such as psychological harm caused by the crime." (§ 1202.4, subd. (d).)

The probation report recommended $10,000 as a restitution fine. The report notes the victim "sustained life-threatening injuries at the hands of the defendant. After two surgeries, he survived and was able to provide a statement to police, which assisted them in determining the defendant was, in fact, the assailant. David . . . explained his life had been financially ruined by the defendant's assault, and had caused him great pain,

25

suffering and made him question his future ability to work. He sold all of his personal belongings to help pay for his recovery and to wait out the criminal justice process to sentencing." These facts are relevant to the judge's decision to increase the restitution amount because they show the offense was extremely serious and the losses suffered by the victim were extreme. (§ 1202.4, subd. (d).) It is conceivable that trial counsel concluded it was futile to argue against these fines and fees in view of the seriousness of the offense and the extreme injury to the victim. (*People v. Thompson*, *supra*, 49 Cal.4th at p. 122 ["Counsel is not ineffective for failing to make frivolous or futile motions"].)

Moreover, the probation officer's report and the record show Reddy may have had some ability to pay. Reddy was in his mid-forties and lived alone in his two-bedroom house located in Indio. His sentencing brief said he was "gainfully employed, owned his own business, had his own employees, was in the middle of a $170K contract, owned his own home." The probation report said he had started a window cleaning and landscaping business, which he closed for about two years during the Great Recession, but later successfully reopened. Thus, the record shows Reddy is industrious and potentially capable of paying the fines either through existing assets or future earning capacity.

Given the seriousness of Reddy's offense, the court's decision to follow the probation department's recommended fine, and the fact that Reddy might have had the ability to pay, Reddy's attorney may have concluded that objecting to the restitution fine would have been pointless. The most Reddy stood to gain by objecting was receiving a hearing. Therefore, if Reddy's counsel felt there was enough for a court to conclude he

had an ability to pay, the objection would have only delayed proceedings. The same considerations apply with equal force to counsel's decision not to object to the fees.

"We cannot speculate, given the absence of information before us, what led to defense counsel's decision not to object, but a myopic focus on [defendant's] financial circumstances that neglects any of the other factors at play in a sentencing hearing may not provide an accurate picture of counsel's strategic calculus." (*Acosta* (2018) 28 Cal.App.5th 701, 707.) "We have no idea why counsel did not raise the ability to pay issue," and therefore conclude defendant's ineffective assistance of counsel claim would be better addressed through a petition for habeas corpus, not on direct appeal. (*People v. Keene* (2019) 43 Cal.App.5th 861, 864-865.)

As for Reddy's objection that the restitution fine exceeded the statutorily recommended amount, we conclude the trial judge didn't abuse his discretion for many of the same reasons. Section 1202.4 places the determination of the fine amount within the discretion of the trial judge, so long as he lands within the $300 minimum and $10,000 maximum. (§ 1202.4, subd (b)(1).) It's recommended that the judge set the fine amount "as the product of the minimum fine pursuant to paragraph (1) multiplied by the number of years of imprisonment the defendant is ordered to serve, multiplied by the number of felony counts of which the defendant is convicted." (§ 1202.4, subd. (b)(2).) However, as we've seen, the statute directs the judge to consider any relevant factors, including the seriousness and gravity of the offense and the extent to which any other person suffered losses as a result of the crime. (§ 1202.4, subd. (d).)

Some of these factors favor imposing a high restitution fine. Under the statutory formula, Reddy would have faced a fine of $3,600 due to its seriousness as reflected in the length of the sentence. The probation report recommended $10,000 without explanation. However, the report notes the victim "sustained life-threatening injuries at the hands of the defendant. After two surgeries, he survived and was able to provide a statement to police, which assisted them in determining the defendant was, in fact, the assailant. David . . . explained his life had been financially ruined by the defendant's assault, and had caused him great pain, suffering, and made him question his future ability to work. He sold all of his personal belongings to help pay for his recovery and to wait out the criminal justice process to sentencing." These facts are relevant to the judge's decision to increase the restitution amount because they show the offense was extremely serious and the losses suffered by the victim were extreme. (§ 1202.4, subd. (d).)

The judge was not required to hold a separate hearing or make express findings as to the factors bearing on the amount of restitution he imposed. (§ 1202.4, subd. (d).) Reddy concedes he didn't raise the issue of his ability to pay, which would have presented the issue to the court. Thus, he didn't present any information to challenge the assertions about the seriousness of the crime or its effect on the victim. Under these circumstances, we can't conclude that the trial court acted arbitrarily or irrationally by imposing the statutory maximum restitution fine.

However, Reddy is entitled to relief from paying any unpaid balance, as of July 1, 2021, of the cost of the presentence report awarded under Penal Code section 1203.1b and the booking fees imposed under Government Code section 29550.

Assembly Bill Number 1869 reflects the intent of the Legislature to offer relief from those (and other) fees retroactively. "It is the intent of the Legislature to eliminate the range of administrative fees that agencies and courts are authorized to impose to fund elements of the criminal legal system and to *eliminate all outstanding debt* incurred as a result of the imposition of administrative fees." (Assem. Bill No. 1869 (2019-2020 Reg. Sess.) § 2, italics added.)

To accomplish this end, the Legislature enacted Penal Code section 1465.9 and Government Code section 6111. Both provisions direct that as of July 1, 2021, the balance of any court-imposed costs under various statutory provisions—including Government Code section 29550 and Penal Code section 1203.1b—is "unenforceable and uncollectible and any portion of a judgment imposing those costs shall be vacated." (Gov. Code, § 6111, subd. (a); Pen. Code, § 1465.9.) Because the new provisions state in plain language the legislative intent to extend the ameliorative changes in the law to relieve the burden of any debt that remains unpaid on and after July 1, 2021, Reddy is entitled to have the fees vacated to the extent they are outstanding as of that date but is not entitled to have them vacated in their entirety. (*People v. Lopez-Vinck* (2021) 68 Cal.App.5th 945, pp. 951-954].)

D. *Victim Restitution*

Reddy argues the trial judge erred by imposing victim restitution without holding a hearing and taking evidence. As a result, he argues, the award of $175,000 in victim restitution is not adequately supported.

1. *Background*

The probation report included a statement from David requesting $175,000 for "lost time and wages, for hardships, pain and the continued suffering, and transportation and recreation vehicles" he had been forced to sell and also asked for attorney fees.

David described the financial effects of the injuries he suffered in the shooting, including that he had been forced to sell a significant amount of personal property to cover hospital fees. He also described his difficulty recovering and said consistent pain and limitations on his mobility had forced him to change his employment, reducing his pay by half. His also claimed his injuries and the five days of absences required to testify in the trial caused him to lose a job. David disclosed he had filed a claim against Reddy. But he didn't disclose whether he recovered a judgment.

The probation officer recommended victim restitution in the amount of $175,000. The report noted that "[a]ny disputes as to restitution amount to be resolved in a court hearing." At sentencing, defense counsel represented that David had recovered $300,000 in the civil suit. However, he made this assertion in another context, and didn't make any argument regarding restitution. The trial court ordered victim restitution to David in the amount of $175,000, "plus any additional amounts to be determined by the probation

department and any disputes as to restitution be resolved in a future court hearing date." Defense counsel didn't object to the victim restitution order and didn't request a future restitution hearing.

### 2. *Analysis*

The Legislature has decreed "a victim of crime who incurs an economic loss as a result of the commission of a crime shall receive restitution directly from any defendant convicted of that crime." (§ 1204.4, subd. (a)(1).) Restitution shall be for economic loss incurred, which includes damaged property including cost of repair, medical expenses and actual and reasonable attorney fees and costs. (§ 1202.4, subd. (f)(3).) Where the victim has suffered economic loss due to the defendant's criminal conduct, the trial court must require restitution to the victim "in an amount established by court order, based on the amount of loss claimed by the victim or victims or any other showing to the court." (§ 1202.4, subd. (f).)

A restitution order must be for the full amount of the victim's economic loss, and "the possibility that the victim may receive a windfall because the third party fails to exercise its remedies does not diminish the victim's right to receive restitution of the full amount of economic loss caused by the perpetrator's offense." (*People v. Duong* (2010) 180 Cal.App.4th 1533, 1537.) The amount of restitution is not offset by payment to the victim from a collateral source that is independent of the defendant, such as the victim's own insurer, as compensation for economic losses attributed to a defendant's criminal conduct. (*People v. Hamilton* (2003) 114 Cal.App.4th 932, 941.) However, payments to

31

the victim by a defendant's insurer are different and must be offset against the restitution obligation. (*People v. Bernal* (2002) 101 Cal.App.4th 155, 167-168.) The offset should occur only "to the extent that those payments [by the defendant's insurer] are for items of loss included in the restitution order." (*Id.* at p. 168; see also *People v. Jennings* (2005) 128 Cal.App.4th 42, 55 [before granting an offset, the court must determine whether payments made by a defendant's insurer were for losses covered by the restitution order].)

We review the trial judge's restitution order for abuse of discretion. (*People v. Millard* (2009) 175 Cal.App.4th at p. 26.) The trial court has broad discretion in setting the amount of restitution and can use any rational method of establishing that amount. (*People v. Sy* (2014) 223 Cal.App.4th 44, 63.) A court abuses its discretion only if its decision is arbitrary, capricious, or based on a demonstrable error of law. (*People v. Atkins* (2005) 128 Cal.App.4th 1376, 1382.)

Reddy argues the restitution order of $175,000 to David was unsupported by evidence and the trial court erred by relying on the amount recommended by the probation officer because there was no proof of David's "actual losses, nor any acknowledgment of the receipt of $300,000 from [Reddy's] insurance company[.]"

The victim restitution statute "does not, by its terms, require any particular kind of proof." (*People v. Gemelli* (2008) 161 Cal.App.4th 1539, 1543.) Where the victim has suffered economic loss due to the defendant's criminal conduct, the trial court must require restitution to the victim "in an amount established by court order, based on the

amount of loss claimed by the victim or victims or any other showing to the court."

(§ 1202.4, subd. (f).) The amount of loss determined by the probation officer based on the victim's statement of loss can be a sufficient basis to set a restitution amount. (*Gemelli*, at pp. 1543-1544.) David's electronic statement provided a factual and rational basis to order restitution. He described his inability to physically recover and consistent pain that forced him to change his employment position due to limited mobility. His weekly pay was reduced by half and testifying for five days in the trial was a contributing factor to being let go from his employment. David thus requested $175,000 for "lost time and wages, for hardships, pain and the continued suffering, and transportation and recreation vehicles" he had been forced to sell, and attorney fees.

"When there is a factual and rational basis for the amount of restitution ordered, no abuse of discretion will be found." (*People v. Phu* (2009) 179 Cal.App.4th 280, 284.) Indeed, "[o]nce the victim makes a prima facie showing of economic losses incurred as a result of the defendant's criminal acts, the burden shifts to the defendant to disprove the amount of losses claimed by the victim." (*People v. Gemelli*, *supra*, 161 Cal.App.4th at p. 1543.) "The defendant has the burden of rebutting the victim's statement of losses, and to do so, may submit evidence to prove the amount claimed exceeds the repair or replacement cost of damaged or stolen property." (*Ibid.*) The probation report and David's statement regarding his losses provided prima facie evidence from which the trial court could order restitution, and Reddy submitted no evidence to rebut it, so the trial judge did not abuse his discretion in accepting that presentation.

33

As for Reddy's argument that David's recovery in the civil suit should have offset the restitution amount, the problem is there was no evidence about the amount David recovered or what the recovery remedied. Defense counsel mentioned the settlement amount during argument when he blamed Reddy's divorce on "the lawsuit filed by [David] where he recovered—I can represent to you because I talked to his attorney on a regular basis while it was going through. He recovered $300,000 . . . as a result of being shot." Attorney argument is not evidence. (*People v. Barajas* (1983) 145 Cal.App.3d 804, 809; Judicial Council of Cal. Crim. Jury Instn. 222.) And the failure of evidence on this point traces to Reddy's failure to object and request a hearing. Thus, Reddy has not established the restitution amount should have been offset by the recovery in the civil lawsuit.

In any event, Reddy has forfeited these challenges. He didn't argue these points below, didn't request a restitution hearing, and didn't object when the trial court ordered $175,000 in victim restitution. The issue regarding the proper amount of restitution is a factual one, and the factual record wasn't developed more precisely because Reddy failed to object or request a hearing. It follows that he has forfeited his claims that the trial court abused its discretion in ordering the amount of restitution.

For the same evidentiary reasons we can't conclude his counsel was prejudicially ineffective. (*Strickland v. Washington* (1984) 466 U.S. 668, 687.) Here, Reddy cannot show prejudice because he cannot establish that David did not incur $175,000 in medical expenses, lost wages, and reasonable attorney fees. Reddy's assertion that an objection to

the restitution order would have benefitted him is speculative because it is not clear on this record who made the payment, who it was intended to benefit, or whether it was for items of loss which would be included in the restitution order.

## III

## DISPOSITION

We vacate the portions of (i) the booking fee imposed under Government Code section 29550 and (ii) the costs of the presentence report imposed under Penal Code section 1203.1b that remain unpaid as of July 1, 2021. We affirm the judgment as so modified.

We remand the matter and direct the trial court to amend the abstract of judgment to reflect the vacatur of any balance of those fees and costs. The court shall forward a copy of the corrected abstract of judgment to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

SLOUGH
J.

We concur:

MILLER
Acting P. J.

FIELDS
J.

35